### In re CELLULAR INFORMATION SYSTEMS, INC., C.I.S. Operating Company–1, Inc., et al., Debtors.

Bankruptcy Nos. 92 B 45024 (BRL), 92 B 45025 (BRL) and 92 B 45027 (BRL) to 92 B 45033 (BRL).

United States Bankruptcy Court, S.D. New York.

Feb. 28, 1994.

---

## MEMORANDUM DECISION AND ORDER ON COMPETING PLANS OF REORGANIZATION

BURTON R. LIFLAND, Chief Judge.

Before the Court are two competing plans of reorganization, one proposed by the Debtors (as hereinafter described) and the other by the Banks (as hereinafter described). The Debtors' Plan (as hereinafter defined) is based upon their confidence in their ability to produce cash flows sufficient to support payments to the Banks, pursuant to a proposed restated secured loan, while maintaining the Lender Liability Suit (as hereinafter defined) against these same Banks. The Banks' Plan (as hereinafter defined), on the other hand, adopts the Debtors' cash flow projections with skepticism, providing for a resort to a controlled liquidation if the Debtors fail to meet their projections. The Banks' Plan also features a compromise of the Lender Liability Suit via a reduction in the principal amount of the Banks' claim. I held a consolidated contested confirmation hearing (the "trial") on both plans.[1] As I must directly address whether either plan merits confirmation it is appropriate to briefly review the Debtors' operations, the dispute with respect to their prepetition relationship with the Banks and the provisions of each plan.[2]

The Debtors own controlling interests in cellular telephone systems serving nine small Metropolitan Statistical Areas ("MSAs") and five Rural Service Areas ("RSAs").[3] The Debtors' corporate structure is as follows. Cellular Information Systems, Inc. ("CIS") is

---

1. The trial was held on December 14–17, 21 & 23, 1993, and counsel presented closing arguments on January 6, 1994.

2. This Memorandum Decision constitutes findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, as made applicable by Federal Rule of Bankruptcy Procedure 9014.

3. The Federal Communications Commission ("FCC") has divided the United States into 734 areas; 306 are designated as MSAs and 428 are designated as RSAs.

the publicly held parent company of C.I.S. Operating Company–1, Inc. ("CIS–1").[4] CIS conducts its cellular telephone operations through the following operating companies, each a wholly-owned subsidiary of CIS–1: C.I.S. of Eau Claire, Inc.; Cellular Information Systems of Florence, Inc.; Cellular Information Systems of Laredo, Inc.; C.I.S. of Lubbock, Inc.; C.I.S. of Pine Bluff, Inc.; C.I.S. of Rapid City, Inc.; C.I.S. of Wausau, Inc.; C.I.S. of Haakon, Inc.; C.I.S. of Beaverhead, Inc.; C.I.S. of Trempealeau, Inc.; and C.I.S. of Vilas, Inc. (collectively, the "CIS–1 Subsidiaries"). The Debtors' chapter 11 cases have been consolidated for administrative purposes only.

The Banks are The First National Bank of Maryland ("First Maryland"); PNC Bank, National Association, successor by merger to Provident National Bank ("PNC"); and National Westminster Bank USA ("NatWest"). While the Debtors' prepetition relationship with the Banks is the subject of the Lender Liability Suit, there is no dispute that in late 1989 the Banks and CIS–1's predecessor-in-interest entered into a loan agreement pursuant to which the Banks agreed to make certain revolving loans up to an aggregate principal amount of $90 million.[5] It is not contested that the Banks hold a properly perfected security interest in all of the shares of stock of CIS–1 owned by CIS and that CIS–1 has pledged to the Banks all of the shares of stock of the CIS–1 Subsidiaries. The Debtors assert that the Banks' security interest in and to all property owned or held by CIS–1 and the CIS–1 Subsidiaries does not extend to the various licenses granted by the FCC to CIS–1 and the CIS–1 Subsidiar-

ies. The Banks have rejected the Debtors' Sixth Joint Plan of Reorganization (the "Debtors' Plan") and CIS's equity security holders have rejected the Banks' Fifth Amended Plan of Reorganization (the "Banks' Plan").[6]

CIS's equity security holders ("Equity" or "Equity Security Holders") retain their respective interests under both plans,[7] and each plan treats the Banks' $94.5 million claim differently, as described *infra*. The Debtors' Plan contemplates the post-confirmation prosecution of the Lender Liability Suit while the Banks' Plan settles this Suit in exchange for a $14.5 million reduction in the principal amount of the Banks' claim. All unsecured creditors, except for the three largest, are unimpaired under both plans. Each impaired unsecured creditor is treated identically under, and has voted to accept, both plans. In addition, each impaired unsecured creditor has indicated which plan each prefers if both plans satisfy section 1129's [8] requirements. *See* 11 U.S.C. § 1129(c). The four-member Official Committee of Unsecured Creditors (the "Committee") has not expressed a position, as it is deadlocked with respect to this issue.[9]

The Banks argue that they need not satisfy the requirements of section 1129(b) because Equity is not impaired under the Banks' Plan. *See* 11 U.S.C. § 1124. In the interest of brevity, I will assume arguendo that the two classes of Equity Security Holders are impaired under the Banks' Plan. As each plan proponent must demonstrate that the impaired rejecting classes are fairly and equitably treated under each proponent's

---

**4.** CIS has two other subsidiaries, C.I.S. Operating Company–2, Inc. and C.I.S. Operating Company–3, Inc., which, along with their respective subsidiaries, have not filed chapter 11 petitions.

**5.** The Debtors' prepetition relationship with the Banks is further discussed in Part IV, *infra*.

**6.** The Banks voted on the Debtors' Fourth Amended Joint Plan of Reorganization and CIS's equity security holders voted on the Banks' Third Amended Plan of Reorganization. The plan proponents have made several modifications to their respective plans before and during the consolidated trial. As noted during the trial, I find that such changes are nonmaterial modifications which do not require resolicitation of the respec-

tive impaired classes of creditors and equity security holders. *See* 11 U.S.C. § 1127(a); Fed. R.Bank.P. 3019.

**7.** The Debtors question whether Equity retains the value of its interest under the Banks' Plan. *See infra* Part III.B.

**8.** Unless otherwise indicated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101—1330 (1988).

**9.** The Committee, however, has expressed a position on the reasonableness and sufficiency of the Banks' proposed settlement of the Lender Liability Suit. *See infra* Part IV.

plan, it is necessary to first determine the Debtors' going concern value. *See Consolidated Rock Prods. Co. v. Du Bois,* 312 U.S. 510, 520, 61 S.Ct. 675, 682, 85 L.Ed. 982 (1941) (finding, in a case under § 77B of the Bankruptcy Act, that "(a)bsent the requisite valuation data, the court was in no position to exercise the 'informed, independent judgment' which appraisal of the fairness of a plan of reorganization entails.") (*quoting National Surety Co. v. Coriell,* 289 U.S. 426, 436, 53 S.Ct. 678, 682, 77 L.Ed. 1300 (1933)); H.R.Rep. No. 595, 95th Cong., 1st Sess. 414 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6370 ("While section 1129(a) does not contemplate a valuation of the debtor's business, such a valuation will almost always be required under section 1129(b) in order to determine the value of the consideration to be distributed under the plan."); *see also In re Chateaugay Corp.,* 154 B.R. 29, 33–34 (Bankr.S.D.N.Y.1993) (holding that section 506(a) requires application of going concern valuation methodology when such property will be used in post-confirmation going concern).

## I. The Debtors' Going Concern Value

The Debtors assert that their going concern value lies between $134 and $159 million. Trial Transcript at 137 (hereinafter, "Tr. at ——."). The Banks argue that this value is $101.4 million.[10] *Id.* at 401. The parties do agree, however, that it is appropriate to determine the Debtors' going concern value through application of the discounted cash flow methodology ("DCF"). *Id.* at 192 (Mr. Harvey Tepner, Debtors' valuation expert) & 401 (Mr. John Sanders, Banks' valuation expert). Although the parties' respective expert witnesses also testified as to the merits of other valuation methodologies, including the comparable sales and company approaches, these techniques were primarily used to measure the reliability and credibility of their respective DCF analyses.

## A. DCF Analysis

A DCF analysis, in general terms, depends on the following three criteria:

1. The size of the expected future cash streams to be generated by the business;

2. The discount rate employed in determining the present value of these income streams;

3. The terminal multiplier used to capture any residual value remaining in the business at the end of the projection period.

Not surprisingly, the Debtors' and Banks' respective expert witnesses disagree with respect to each of these criteria.

The Debtors' expert witness, Mr. Harvey Tepner, is a senior vice president at Dillon, Reed & Co., Inc., an investment banking house. Mr. Tepner has advised debtors, creditors and equity security holders in the chapter 11 cases of, among others, American Health Care Management, The LTV Corporation, Resorts International, Texaco and U.S. Home. *Id.* at 109–10. Mr. Tepner was qualified "as an expert in valuations and review of feasibility of financial projections in reorganization cases." *Id.* at 110. Prior to this engagement, however, Mr. Tepner had only minimal experience in valuing cellular telephone companies,[11] and had never advised a purchaser of a cellular telephone system. *Id.* at 111, 183. Mr. Tepner's valuation of the Debtors was based, in part, upon a modification of a cash flow projection which had initially been generated by the Debtors' management. *Id.* at 123.

The Banks' expert witnesses, Mr. John Sanders and Mr. John Kane, have considerable experience in valuing and analyzing the operations of cellular telephone companies. Mr. Sanders is a principal at Harrison, Bond & Pecaro, a consulting firm which provides valuation appraisals to communications industry clients. Mr. Sanders has valued approximately twenty-five cellular companies over the last two years and was qualified as "an expert in the valuation of cellular compa-

---

**10.** These figures have been adjusted to reflect that the Debtors presently hold $9 million in proceeds from the prior sale of certain cellular systems.

**11.** Mr. Tepner last valued a cellular company over a decade ago. Tr. at 111.

nies." *Id.* at 391. Mr. Sanders assigned a separate going concern value to each of the Debtors' systems after he and members of his firm visited the Debtors' markets, inspected technical facilities, interviewed employees, and compiled data on competitors and economic conditions in those markets.

Mr. Kane is president of Kane, Reese Associates, which provides valuation, management, and technical consulting to the communications and media industries. Mr. Kane was qualified as "an expert in the operations of cellular companies(,)" *id.* at 523 & 526, and as "an expert in valuing cellular systems." *Id.* at 593.[12] Mr. Kane and members of his firm inspected the Debtors' systems, interviewed the Debtors' management and reviewed the Debtors' operating reports, roaming agreements, billing records and financial statements.

### 1. Cash Flow Projections

The Banks' expert witnesses testified that the Debtors' cash flow projections [13] are not realistic.[14] This difference in opinion does not arise from dry technical considerations, but from fundamentally different views of the merits of the Debtors' business strategy. While the parties' experts' opinions diverged on a number of fronts, the Debtors' ability to generate substantial roamer revenue (as hereinafter described) lies at the core of the dispute over the Debtors' cash flow projections.

#### a. Debtors' Projections of Roamer Revenue

As previously noted, the Debtors operate cellular telephone systems in nine MSAs and five RSAs. Those persons who have contracted with the Debtors for cellular telephone service within one of these MSAs or RSAs are referred to as home subscribers. When a cellular telephone user who is not a home subscriber travels through one of these MSAs or RSAs, she is said to "roam" into these service areas. When she uses her cellular phone while in one of the Debtors' MSAs or RSAs, her telephone call is processed by the Debtors' cellular system and the Debtors charge a fee for the use of their system. Rates for roamer calls are set under certain bilateral agreements which the Debtors have entered into with various other cellular telephone companies.[15] The roamer customer is not billed directly by the Debtors for roaming calls, but by her home cellular company. As the rates for roaming calls can exceed fees for calls made within one's home cellular system, cellular companies often subsidize their users' roaming charges and do

---

**12.** The Banks, however, relied primarily on the report Mr. Sanders prepared with respect to the Debtors' going concern value. *See* Harrison, Bond & Pecaro Appraisal of Fair Market Value of Certain operating Assets of C.I.S. Operating Co.–1, Inc., as of August 30, 1993, admitted into evidence as Banks' Exhibit 55 ("Sanders Valuation Report").

**13.** For the purpose of a DCF analysis, the proper measure of cash flow is Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA"), less capital expenditures, net changes in working capital accounts, and cash taxes. Tr. at 129–130; Sanders Valuation Report at 43. However, as the parties referred to EBITDA during the trial, I will also use this as a measure of cash flow.

The Debtors project future cash flow, as measured in terms of EBITDA, as follows: $6.3 million in 1994; $10.3 million in 1995; $15.3 million in 1996; $20.9 million in 1997; $28 million in 1998. The Debtors project that annual EBITDA will remain at $28 million between 1999 and 2003. *See* Debtors' Consolidated Income Statement, admitted into evidence as Debtors' Exhibit 5.

**14.** As Mr. Kane stated, "I think the [Debtors'] projections don't pass the straight face test and I don't mean this as cruelly as it sounds, but they don't work." Tr. at 546.

**15.** The cellular telephone business is organized as a duopoly within each market. The FCC has granted two licenses to operate a cellular system in each service area, one to the local telephone company and the second, by lottery, to another entity. The former are referred to in industry parlance as "wireline carriers," the later as "non-wireline carriers." Tr. at 407. The Debtors operate wireline and non-wireline carriers in different markets. *Id.* at 424.

If a customer's home service provider is a wireline carrier, her roamer call is serviced by the wireline carrier in the service area she roams into. Although the parties' respective expert witnesses testified as to the possibility that a wireline customer could access the non-wireline carrier while roaming, current technology does not presently allow the customer such freedom of choice. Therefore, where the Debtors operate a wireline carrier, they enter into roaming agreements with other wireline carriers, and vice-versa.

not bill their customers the full rate charged under the applicable bilateral agreement.

Several of the Debtors' cellular systems serve sparsely populated areas which are adjacent to better populated regions. The Debtors compare their roamer business to a telecommunications toll road, assessing fees from travellers who make telephone calls while traversing through one of their systems. While approximately 10% of the average cellular company's revenue is derived from roamers, over 45% of the Debtors' current cash flow is attributable to roamer revenue. Tr. at 402–03.[16] The Debtors project the following compound growth in roamer revenue: 32% in 1994, 41% in 1995, 40% in 1996, 35% in 1997 and 30% in 1998. Tr. at 199–200.

The Banks' expert witnesses credibly demonstrated that Mr. Tepner had failed to account for a variety of competitive pressures, thus rendering his roamer cash flow projections unrealistic.[17] The Debtors' current bilateral roaming agreements generally provide for a $3 per day access fee and a 99 cent per minute telephone usage charge. Mr. Tepner assumed that this rate would remain steady for the first five years after confirmation. Tr. at 123, 209.

Messrs. Sanders and Kane testified that competitive pressures would either result in decreased roamer usage at the present rates or a decrease in such rates, including the elimination of the $3 per day access charge. Tr. at 415, 563–64. They testified that the trend in the cellular industry is to create integrated, seamless webs of regional and even national cellular coverage. Such webs are part of a strategy to stimulate usage of cellular phones among all strata of society by reducing the cost of cellular phone calls. Id. at 409–11, 557 & 560.[18]

The Banks' expert witnesses provided examples of downward roamer pricing pressure, describing several cellular networks which presently charge substantially less than $3 per day and 99 cents per minute in roaming fees. Mr. Kane testified that two cellular networks, Mobile Link, which is run by the regional Bell companies, and North American Cellular Network, require that participating cellular systems not charge a daily access fee for roamer calls. Id. at 560. Mr. Sanders testified that Southwestern Bell, the Debtors' competitor in Lubbock, Texas, operates the "Lonestar Roaming Network" throughout Texas. Id. at 409. He testified that Southwestern Bell charges its customers fifty cents per minute, with no access charge for all roamer calls within Texas.[19] He noted that if a person made two roamer calls of two minutes each on each business day in the Debtors' Lubbock system, she would pay approximately $140 per month. By compari-

---

16. A system-by-system analysis of the Debtors' roamer revenues for the twelve month period ending December 31, 1992 yields the following approximate results:

| System | Percentage of Revenue Attributable to Roamers |
|---|---|
| Pine Bluff | 54% |
| Florence | 51% |
| Laredo | 38% |
| Lubbock | 35% |
| Wisconsin Cluster | 89% |

See Sanders Valuation Report at 24. In addition, Mr. Sanders' uncontroverted testimony was that $2.1 million of the $2.9 million increase in revenue for the ten months ending 1992 was attributable to roamer revenue. Tr. at 570.

17. Mr. Kane opined that the Debtors' reliance on roamer revenue "just defies gravity, defies what is going on in the industry." Tr. at 543.

18. Mr. Sanders noted that this strategy is in accord with the application of classic diffusion theory to an industry which relies on a new or emerging technology. According to Mr. Sanders, classic diffusion theory holds that the first purchasers of a new product or service are those who value it the most and will therefore pay more for it. As the product becomes more widely disseminated within society, consumers who are more cost-conscious begin to use, or buy into, the new technology. Per unit profit margins are decreased, resulting in economic pressure on marginal producers or service providers. Id. at 413. While Mr. Tepner also testified that prices would decrease as more people use cellular phones, he did not conclude that the Debtors' roamer charges would be affected in this fashion. Id. at 128.

19. Mr. Rory Phillips, the Debtors' senior vice president and chief financial officer, testified that Southwestern Bell's roamer charges equal the Debtors' $3 daily access charge and 99 cent per minute fee. Tr. at 76. Mr. Phillips made no mention of the Lonestar Roaming Network. I do not find his testimony persuasive in this regard.

son, such calls would only cost $40 per month if she used Southwestern Bell's Lonestar Roaming Network while calling from the Lubbock system. Tr. at 406. While I recognize that a cellular subscriber would have to change her home cellular provider in order to access the Southwestern Bell Lubbock cellular system,[20] this comparison provides a striking example of the competitive pressures the Debtors currently face and foreshadows future challenges. In view of Messrs. Sanders and Kane respective credible testimony, I conclude that the Debtors' aggressive projections of roamer revenue are not convincing.

#### b. Debtors' Projections of Home Subscriber Revenue

Messrs. Kane and Sanders also testified that the Debtors' projections of home subscriber revenue were not realistic. Although the Debtors primarily depend upon roamer revenues, home subscriber revenues account for a significant portion of projected future cash flows. The Debtors forecast that home subscriber revenue will increase in excess of 20% annually during the first five years postconfirmation. *Id.* at 127. Mr. Tepner asserted that such growth is in accord with projected industry growth rates. *Id.* Messrs. Sanders and Kane testified, however, that the Debtors' systems, both in terms of their demographics and geographic synergies, are below industry norms.

Mr. Sanders analyzed the demographics of each service area in which the Debtors operate a cellular system.[21] Although the demographic data is rather dry, the following brief recapitulation underscores the difficulties the Debtors will encounter in attempting to realize increases in the number of subscribers and in overall cellular telephone usage on a par with national industry norms.

In the Pine Bluff, Arkansas system, population is projected to grow by 0.1% annually until 1996, compared to projected annual growth of 1.0% for the nation as a whole. *Id.*

at 25. Effective Buying Income ("EBI") growth is expected to lag behind the national average, and EBI per household in 1991 was only 76% of the national average. *Id.* at 26. EBI is an important measurement because persons with significant disposable incomes are more likely to use cellular telephones. *Id.* The system area's unemployment rate was 12.1% in 1992, comparing unfavorably with the 7.6% national rate. *Id.* at 27-8. In the Florence, Alabama system, population is expected to grow by 0.1%, and while household EBI growth should be consistent with national averages, 1991 household EBI was only 71% of the national average. *Id.* at 52, 53. Furthermore, 42% of the area's households earn less than $20,000 annually. *Id.* at 53.

The Laredo, Texas system presents a slightly different picture. Here, population growth is strong, 2.5% annually until 1996, but the economic picture remains grim. *Id.* at 71. Income growth is expected to lag behind national averages, and per household EBI in 1991 was only 73% of the national average. *Id.* at 72. The system area's 1992 unemployment rate was 9.4%. *Id.* at 73. The Lubbock, Texas system's population is projected to grow less swiftly than the nation's. *Id.* at 89-90. Overall EBI growth is expected to lag behind the national average and household EBI is only 86% of the national average. *Id.* at 90. The unemployment rate, however, is approximately 1% below the national average. *Id.*

As the foregoing demographic data indicate, it appears unlikely that the Debtors' markets will provide fertile ground for the revenue growth called for under their projections.[22] Even if the Debtors' markets have the capability of producing such revenue, the Debtors will have to compete in each market against those cellular companies which Mr. Kane referred to as the industry's "big boys" during the trial. Tr. at 601-04.

---

**20.** *See supra* note 15.

**21.** The Debtors did not challenge any of the facts or demographic projections reported in the Sanders Valuation Report, and did not dispute Mr. Sanders' conclusion that "the economic potential for many of the subject markets is not impressive." Sanders Valuation Report at 11.

**22.** The Debtors asserted that the lower cost of living in these service areas means that below average EBI would not preclude persons from using cellular telephones. The Debtors, however, did not adduce any credible testimony in support of this argument.

While there was some dispute as to the number of subscribers which certain of the Debtors' competitors had in certain markets, there is no question that the Debtors compete against larger, better financed companies which are well positioned to enjoy substantial economies of scale unavailable to the Debtors. For example, Southwestern Bell, the Debtors' competitor in Lubbock, is the largest cellular operator in Texas and has almost 33 million "pops" nationwide. *Id.* at 555. A "pop," [23] as this term is used in the cellular industry, is the number of people within a particular service area multiplied by the particular company's percentage ownership of that cellular system. In other words, the pop measurement illustrates how many persons a cellular company has the potential to serve. In Laredo, the Debtors compete against U.S. Cellular, which has over 21 million pops. *Id.* GT Contel, the Debtors' competitor in Florence, has approximately 54.5 million pops. *Id.* In Pine Bluff, the Debtors compete against McCaw Communications, the cellular industry giant with over 72 million pops. *Id.* at 556. By way of comparison, the Debtors have approximately 920,000 pops. These larger cellular companies, which are concentrating on developing regional webs or clusters of cellular coverage, enjoy economies of scale which are not available to the Debtors, who have small, geographically dispersed markets.[24] This disadvantage, combined with the Debtors' lackluster marketing efforts[25] and their markets' poor demographics, leads to the conclusion that the Debtors will encounter significant difficulty in meeting their home subscriber projections.[26]

In view of the foregoing, I do not find that the Debtors' cash flow projections provide a credible foundation from which to confidently determine the Debtors' going concern value.

c. Banks'. Cash Flow Projections

Mr. Sanders projected the Debtors' future cash flows on a system-by-system basis. The Debtors did not challenge Mr. Sanders' more conservative projections, and I need not summarize those figures here. I find, because the Debtors do not operate geographically contiguous cellular clusters, that it is appropriate to value each of the Debtors' systems separately. I further find, in light of the Debtors' business plan, competitive pressures, industry trends and Mr. Sanders' experience in and knowledge of the cellular industry, that Mr. Sanders' projections of revenue from cellular operations are credible.

However, just as Mr. Tepner underestimated certain competitive challenges, Mr. Sanders did not account for the Debtors' net operating losses ("NOLs"). As previously noted, taxes are subtracted, along with capital expenditures and the net change in working capital accounts, from EBITDA to yield the income stream valued in a DCF analysis. *See supra* note 13. A corporation, generally speaking, may use its NOLs to shelter future income from taxation. Mr. Sanders' explanation that he did not consider the Debtors' NOLs because he was valuing certain assets, as opposed to the Debtors' stock, Tr. at 437, is not persuasive in the context of a DCF analysis. As consideration of the NOLs

---

**23.** During the trial, the parties also used the term "effective pop." For clarity, I will only use the term "pop."

**24.** As Mr. Sanders noted, in CIS "we have a very, very small system down near the Mexican border in Laredo, we have a very, very small system up near the Canadian border in northern Wisconsin, we have another small system that's located in the isolated part of the northern Texas panhandle, we have another system that's located in a rural and relatively low income area of Arkansas." Tr. at 424.

**25.** Mr. Sanders also testified that the Debtors have a relatively high churn rate. A churn rate is the percentage of a system's customers who cancel service subscriptions during a particular time period. A system with a high churn rate

must generate a substantial amount of new customers in order to simply keep its subscriber base from shrinking. Sanders Valuation Report at 14.

**26.** In addition, I note that the Debtors may not have appropriately accounted for a decline in rates charged to home subscribers. The Debtors projected that such rates would decline by 3% per year while Mr. Kane reported that the leading investment bank in the cellular industry, Donaldson, Lufkin & Jenrett, has projected annual declines of 6% in such charges. In adjusting the Debtors' cash flow projections, Mr. Kane assumed that the Debtors' home subscriber rates would decline by 4% annually. Tr. at 564–65.

would increase the Debtors' cash flows for the purpose of a DCF valuation, Mr. Sanders' valuation must be adjusted accordingly.

### 2. Discount Rate

The next issue is application of the appropriate discount rate. Mr. Tepner employed a range of between 12.5% and 17.5%, *id.* at 134, and Mr. Sanders used 14%. *Id.* at 438.

Mr. Tepner employed a Weighted Average Cost of Capital ("WACC") analysis to determine the discount rate. The WACC approach involves selecting companies which are similar in size, business mix, and profitability to the company which is to be valued. Mr. Tepner calculated that these companies' average after-tax cost of debt and equity ranged from 11% to 11.5%. *Id.* at 133. Mr. Tepner adjusted these figures to reflect that the Debtors are much smaller and face significantly greater risks than the cellular companies used in his WACC analysis. This adjustment yielded a discount rate in the 12.5% to 17.5% range. *Id.* at 145.

Mr. Sanders testified that he generally uses a 12% discount rate when valuing a cellular company, and he used this rate in a valuation of the Debtors' assets conducted in April 1992. *Id.* at 437–38. In valuing the Debtors as of August 30, 1993, however, Mr. Sanders used a 14% discount rate. Mr. Sanders testified that he increased the discount rate because of the level of risk associated with his projections. The Debtors asserted that Mr. Sanders improperly double-counted risk, as he used more conservative cash flow projections and then additionally used a discount rate increased by 2% to account for risk. Tr. at 438–48. Accounting for risk in more than one element of a financial valuation model, however, is not improper per se. If circumstances warrant, the risk component in a valuation analysis may be allocated between the cash flow projections and discount rate.

The cellular telephone industry faces substantial systematic, industry-wide risk due to the possibility of technological obsolescence. As Mr. Sanders noted in his report, "(i)n

recent years, the FCC has issued many additional licenses for other mobile communications technologies, such as Specialized Mobile Radio ("SMR"), paging, Personal Communications Networks ("PCN"), and conventional mobile telephones. Cellular telephone operators face increasing competitive pressure from these and other emerging technologies." Sanders Valuation Report at 5–6. Mr. Tepner also stated that competing technologies pose a substantial business risk to the cellular industry, but he considered that such technologies would not affect the Debtors' relatively remote markets for some time. Tr. at 124, 126. In view of the fact that certain of these technologies are, in part, designed to foster wireless communication across the entire nation, I do not share Mr. Tepner's optimism.

Therefore, given the level of risk associated with the Debtors' operations, both in terms of competitors within their industry and competing technologies, I conclude that Mr. Sanders has not, through application of a 14% discount rate, overstated the level of business risk in his projections. I note that Mr. Sanders' customary 12% rate practically mirrors Mr. Tepner's pre-adjustment 11%–11.5% range, and Mr. Sanders' 14% rate lies below the median point of the range of discount rates Mr. Tepner applied.

### 3. Terminal Multiple

The third element of the analysis involves the calculation of a terminal value, the residual value remaining in the business at the end of the projection period. Mr. Tepner used a range of terminal multiples between 6 and 8, implying a discount rate of between 12.5% and 16.7%.[27] Despite Mr. Tepner's claims that his terminal multipliers "reflect a conservative base for valuation", *id.*, they actually rely on a lower range of discount rates than he used in his DCF analysis. As previously noted, the upper limit of that range was 17.5%. Thus, Mr. Tepner asserted, through the choice of his terminal multiples, that despite the increased risks

---

27. Mr. Sanders used a terminal multiple of 10. Tr. at 402. This figure is not comparable to Mr. Tepner's range of multiples because Mr. Sanders used a ten, rather than a five, year projection period.

from emerging new technologies and larger, more efficient competitors, the Debtors' enterprise will actually be less risky after five years. This does not appear to be an especially conservative analysis.

Mr. Sanders also appears to have strayed in his terminal calculations. Mr. Sanders adjusted his terminal value downward to reflect a capital gains charge after a sale of the Debtors' systems in the year 2003. This treatment was erroneous. A terminal value is a short-cut for determining the Debtors' ability to generate cash flow between the end of the projection period and perpetuity. It does not represent a sale of the company per se.[28] And since it summarizes future cash flows after, *inter alia*, taxes, it already takes ordinary income taxation into account. By making a downwards adjustment to his sales value to account for a supposed capital gains charge, he improperly lowers the Debtors' going concern value. This error, however, is tempered by the fact that it occurs in the later years of the analysis, where the accumulated discount rate serves to minimize the present value of such error.

In view of the foregoing discussion, and after considering all of the credible evidence and testimony adduced during the trial, I conclude that the Debtors' going concern value is $110 million.

### B. Alternative Valuation Methodologies

Both parties employed alternative valuation methodologies, the comparable sales and comparable company approaches, to bolster their primary DCF analyses. As I have arrived at the Debtors' going concern value through application of a DCF analysis which was predicated upon Mr. Sanders' analysis, I will very briefly address why I do not find Mr. Tepner's comparable sales and company valuation techniques apt under the circumstances.

As their names imply, these valuation methodologies require the identification of sales and companies, respectively, which are comparable to these Debtors. I do not find that these methodologies are of any assistance in this matter due to the absence of comparable sales and companies, respectively. A comparable company analysis purports to impute a value for the Debtors based on the market capitalization of similar companies. *See* "Summary of Financial Information for Selected Cellular Companies," admitted into evidence as Debtors' Exhibit 73. However, the companies which Mr. Tepner identified for comparison are not only much larger than these Debtors, but as Mr. Tepner recognized, are more mature because they have track records of generating positive EBITDA. Tr. at 144. I conclude that because of the lack of comparable companies this methodology is of limited assistance to the Court. *See id.* at 431.

Coincidentally, a sale which Mr. Tepner identified for comparison at trial, when applied to these Debtors, results in going concern value of approximately $110 million. I do not find that this analysis, even in view of its result, is suitable. The Debtors' expert asserted that because the proposed sale of the Debtors' Eau Claire, Wisconsin cellular system is for approximately $12 million in cash, the Debtors' interest in this system is worth $123 per pop. *Id.* at 153–54. The Eau Claire transaction, however, is not free standing. The Eau Claire sale is contingent upon the sale of the Duluth, Minnesota and Burnett, Wisconsin cellular systems which are owned by CIS Operating Co., Inc.–2 which, as previously noted, is not one of these Debtors. Tr. at 388; *see supra* note 4. The parties stipulated that the proposed purchase price of these systems is an assumption of approximately $33 million of debt. This debt will have a seven year term with interest accruing at prime plus one percent. The purchaser will not make any payments for the first five years. Tr. at 388. Although the parties have failed to provide the Court with sufficient information to value this consideration, I find that in view of the nature of the entire transaction, with all of the cash allocated towards the purchase of the Eau Claire system, the $123 per pop figure used by Mr. Tepner is not useful as a comparable here.

---

28. Although, at least in theory, cash flow times a properly determined terminal multiple should represent the price a buyer would be willing to pay for a business.

## II. The Debtors' Plan

Having determined that the Debtors' going concern value is $110 million, I next consider whether the Debtors' Plan is confirmable over the Banks' rejection and then separately address whether the Banks' Plan merits confirmation in view of its rejection by CIS's equity security holders.

A plan shall be confirmed over impaired classes' dissents if the "plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). At minimum, a fully secured creditor is treated fairly and equitably if it retains the lien securing its claim and receives deferred cash payments which have a present value equal to the amount of its claim. 11 U.S.C. § 1129(b)(2)(A); see also Federal Sav. & Loan Ins. Corp. v. D & F Constr., Inc. (In re D & F Constr., Inc.), 865 F.2d 673, 675 (5th Cir.1989) ("(T)echnical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is "fair and equitable." 5 Collier on Bankruptcy P. 1129.03 at 1129–52 (15th ed. 1988).").

■ There is a split of authority as to whether a plan proponent must satisfy the dictates of section 1129(b) by a preponderance of the evidence or by clear and convincing evidence. Compare Heartland Fed. Sav. and Loan Ass'n v. Briscoe Enters., LTD., II (In re Briscoe Enters., LTD., II ), 994 F.2d 1160, 1164–65 (5th Cir.1993) (finding that preponderance of the evidence is applicable cramdown standard) and In re MCorp Fin., Inc., 160 B.R. 941, 960 (S.D.Tex.1993) (same) with In re Rusty Jones, Inc., 110 B.R. 362, 373 (Bankr.N.D.Ill.1990) (finding that clear and convincing is the appropriate standard) and In re Future Energy Corp., 83 B.R. 470, 481 (Bankr.S.D.Ohio 1988) (same); see also In re Kennedy, 158 B.R. 589, 601 n. 17 (Bankr.D.N.J.1993) (In denying confirmation, finding that "(t)he burden is on the debtor to show, by a preponderance of the evidence,

that the protection provided under the proposed plan is completely compensatory.") (citing Briscoe, 994 F.2d at 1165).

Application of the clear and convincing standard is limited, in civil cases, to those instances in which "particularly important individual interests" require protection. Addington v. Texas, 441 U.S. 418, 424, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979); cf. Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991) (holding that preponderance of the evidence is applicable standard for exceptions to discharge under section 523(a)). In Briscoe, the Fifth Circuit reasoned that confirmation under section 1129(b) does not implicate the " 'liberty' categories" which the Supreme Court has referred to in applying the clear and convincing standard, but that the individual interests affected are analogous to those implicated in a section 523(a) action. Briscoe, 994 F.2d at 1164–65; see also id. at 1164 ("(a) number of bankruptcy courts have used the clear and convincing standard in a cramdown, ... (none of them offer) a satisfactory explanation why that is the appropriate standard.") (footnote omitted). I find the Fifth Circuit's analysis persuasive and conclude that a plan proponent must demonstrate that its plan satisfies section 1129(b) by a preponderance of the evidence.

### A. Methodology to Determine Adequacy of Proposed Cramdown Interest Rate

The Banks' primary objection to the Debtor's Plan is that the Debtors propose to pay a rate of interest on the Banks' $94.5 million claim which fails to provide the Banks with a stream of payments which have a present value equal to the amount of their claim. The Debtors propose to pay the Banks 3% over the London Interbank Offered Rate for U.S. dollar deposits for a three month term, as offered to prime banks in the London Interbank Market ("LIBOR").[29]

29. Prior to closing argument, the Debtors had proposed to pay interest at LIBOR plus 2½% on the principal amount of the Banks' claim. I will consider evidence adduced in support of, and in opposition to, that interest rate in determining whether LIBOR plus 3% is an adequate cramdown rate. See 11 U.S.C. § 1127(a) ("After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.")

### 1. Relevance of 1989 Term Loan Agreement's Interest Rate

The Debtors proffered the testimony of Mr. Rory Phillips, their senior vice president and chief financial officer. Through this proffer, Mr. Phillips asserted that the proposed interest rate was "justified based on the original (1989) loan agreement between the Debtor and the Banks . . . ." Tr. at 54. The interest rate under an original loan agreement is informative as to a proposed cramdown interest rate's merits to the extent that the original rate was set near in time to a debtor's chapter 11 proceeding and in a period in which market conditions were substantially similar to present conditions. *See General Motors Acceptance Corp. v. Jones,* 999 F.2d 63, 70 (3rd Cir.1993); *Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.),* 755 F.2d 1336, 1339 (8th Cir.1985); *In re Kellogg Square Partnership,* 160 B.R. 343, 363 (Bankr.D.Minn.1993). However, the Debtors have failed to demonstrate that either of these criteria are present.

The original loan was executed over four years ago, on December 21, 1989, *see* Second Amended and Restated Loan Agreement, dated as of December 21, 1989 (the "1989 Term Loan Agreement"), and was last amended in April 1991. *See* Restating Agreement, dated as of April 9, 1991, to Third Amended and Restated Loan Agreement, dated as of November 30, 1990 (the "1991 Term Loan Agreement").[30] Thus, the 1989 Term Loan Agreement was not entered into near in time to these proceedings and was not the effective agreement at the time these Debtors' entered into chapter 11. *Cf.* Debtors' Plan § 1.06 (defining "Bank Agreement" as the 1991 Term Loan Agreement).

Market conditions have undergone substantial changes since 1989, and the challenges which the Debtors faced in 1989 are

materially different than those they currently confront. In December 1989 the Debtors were immature operators in an immature industry. In February 1994, the Debtors are still relatively immature while the cellular industry has, in large measure, attained maturity. Unlike other cellular telephone companies, the Debtors did not enjoy rapid, sustained growth during the industry's infancy. As described in Part I, *supra,* the Debtors rely heavily on roamer revenue while established cellular companies are lowering the cost of roamer calls and developing seamless regional webs of cellular telephone coverage. In addition, the Debtors face strong competition in each of their widely dispersed markets, and are not well-positioned to enjoy efficiencies which arise from operating geographically contiguous cellular systems. Therefore, in view of the foregoing, the 1989 Term Loan Agreement's interest rate does not stand as a persuasive benchmark from which to measure whether the Debtors are proposing an adequate cramdown rate.[31]

### 2. Coerced Loan & Riskless Rate Methodologies

Courts have employed a variety of methods to determine whether a proffered interest rate offers the secured creditor the present value of its claim over time. *See In re River Village Assoc's,* 161 B.R. 127, 135–36 (Bankr.E.D.Pa.1993) (collecting cases and setting forth seven approaches used to determine applicable interest rates under §§ 1129(a)(9)(B)(i) and (C), 1129(b)(2)(A)(i)(II), 1225(a)(5)(B)(ii) & 1325(a)(5)(B)(ii), respectively, which have a present value requirement); *In re Oaks Partners, Ltd.,* 135 B.R. 440, 443 (Bankr. N.D.Ga.1991) ("(N)either the statute (section 1129(b)) nor the legislative history gives any meaningful guidance on how the interest rate should be determined."); *In re Computer Optics, Inc.,* 126 B.R. 664, 671 (Bankr.D.N.H. 1991) ("(T)he case law with regard to an

---

**30.** The 1989 Loan Agreement's interest rate, depending upon the Debtors' performance, ranged from LIBOR plus 1.75% to 2.75% or, as measured against the prime rate, from prime plus .5% to 1.5%. The interest rate under the 1991 Loan Agreement, which was only calculated with reference to the prime rate, ranged from prime plus 1% to prime plus 1.5%, depending upon the Debtors' pops.

**31.** In view of this conclusion, I need not address the Banks' argument that the Debtors may not select an interest rate from the 1989 Term Loan Agreement while ignoring the Debtors' inability to satisfy certain of that Agreement's covenants.

appropriate discount rate for cramdown purposes has blossomed into a 'many-colored splendor' of conflicting and sometimes indecipherable formulas...."); *see also LTV Corp. v. PBGC (In re Chateaugay)*, 126 B.R. 165 (Bankr.S.D.N.Y.1991) (litigants presented five different methodologies to determine discount rate for calculation of PBGC employer liability claims), vacated by settlement stipulation, 1993 WL 388809 (S.D.N.Y.1993); *cf. In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 898 (Bankr.S.D.N.Y.1993) (discussing continuing persuasive authority of *In re Chateaugay* decisions notwithstanding vacatur pursuant to settlement).

Courts do agree, however, that the present value of the payments "depends on the interest rate that is used to compute the payments' value." Waltraud S. Scott, *Deferred Cash Payments to Secured Creditors in Cram Down of Chapter 11 Plans: A Matter of Interest*, 63 Wash.L.Rev. 1041 (1988); *see also id.* at 1045 n. 22 ("(t)he court must 'discount' all future payments by an interest rate it deems appropriate.").[32] The leading treatise, *Collier on Bankruptcy*, suggests that the sufficiency of a proposed cramdown interest rate should be measured against a hypothetical "coerced loan":

> It is submitted that deferred payment of an obligation under a plan is a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged as obtained by the creditor making a loan to a third party with similar terms, duration, collateral and risk. It is therefore submitted that the appropriate discount rate must be determined by reference to the 'market' interest rate.

5 *Collier on Bankruptcy*, P. 1129.03 at 1129–99 (15th ed. 1989); *accord General Motors Acceptance Corp. v. Jones*, 999 F.2d 63 (3rd Cir.1993) (applying coerced loan methodology under § 1325(a)(5)(B)(ii)); *United Carolina*

*Bank v. Hall*, 993 F.2d 1126, 1130 (4th Cir. 1993) (finding that, in chapter 13 cramdown, secured lender's rate of return should match rate "which the creditor would otherwise be able to obtain in its lending market."); *Hardzog v. Federal Land Bank of Wichita (In re Hardzog)*, 901 F.2d 858, 860 (10th Cir.1990) (noting that, in chapter 12 case, in the absence of "special circumstances," interest rate under plan should be "the current market rate of interest used for similar loans in the region."); *but see Computer Optics*, 126 B.R. at 672 ("(T)here is no market in the real world for 'similar loans' when dealing with a reorganized entity coming out of a chapter 11 proceeding (,) and it accordingly is not surprising that the case decisions taking such approach exhibit much conjecture and inconsistent results."); Scott, *Deferred Cash Payments, supra*, at 1051–57 (criticizing coerced loan methodology).

█ The Banks argue that the Debtors' Plan must provide the Banks with a rate of interest which is not only "determined by reference to the 'market' rate," *id.*, but is actually "equivalent to a market rate." *See* Banks' Post–Trial Memorandum of Law at 9. Using a market rate of interest as a cramdown rate, however, would grant these secured creditors a stream of payments whose present value would exceed the face value of the Banks' claim. This is because a market rate of interest is designed to offset the lender's cost of servicing a loan and to produce a profit. *Hardzog*, 901 F.2d at 860; *In re Ropt Ltd. Partnership*, 152 B.R. 406, 409 (Bankr.D.Mass.1993); *see also In re Bloomingdale Partners*, 155 B.R. 961, 977 (Bankr. N.D.Ill.1993) ("One of the reasons for rejecting the 'market rate' or 'coerced loan' theory is that an inefficient ... cram-down market allows lenders ... to charge a premium, a rate of interest in excess of actual risks of the loan. Earning this premium is commonly called arbitrage, another word for 'profit.' "). An interest rate which provides for a

---

32. Courts often use the synonymous terms discount rate and interest rate interchangeably, as both refer to the time value of money. *See Kellogg*, 160 B.R. at 363 n. 34; *see also* H.R.Rep. No. 595 at 414 U.S.Code Cong. & Admin.News 1978, p. 6370 ("[I]f the interest rate paid is equivalent to the discount rate used, the present value and face future value will be identical.") For the sake of clarity, I will only use the term interest rate in discussing whether the Banks receive the present value of their claim through the future stream of payments proposed under the Debtors' Plan.

stream of payments which has a present value equal to the face amount of a claim has three components: (1) an estimation of inflation; (2) a "real" interest rate; and (3) a premium for risk. *River Village,* 161 B.R. at 139 (*citing* Scott, *Deferred Cash Payments,* at 1046); *accord Oaks Partners,* 135 B.R. at 445.

Courts which subscribe to the "riskless rate plus general percent adjustment" approach, *Computer Optics,* 126 B.R. at 672 n. 12, stress that a court can account for the first two components by using the rate of interest paid on a treasury bond which has a remaining maturity equal to the length of the payment schedule under the plan. *United States v. Doud,* 869 F.2d 1144, 1146 (8th Cir.1989); *Kellogg,* 160 B.R. at 363; *In re SM 104 Ltd.,* 160 B.R. 202, 232 (Bankr. S.D.Fla.1993); *Bloomingdale,* 155 B.R. at 983; *Computer Optics,* 126 B.R. at 672. While this approach insures that a cramdown interest rate does not include the lender's profit margin and loan servicing costs, it leaves a court with the difficult task of "ascribing a particular number of basis points to the overall risk factor(.)" *Oaks Partners,* 135 B.R. at 447; see also *Hardzog,* 901 F.2d at 860 ("Courts are not well situated to craft and determine interest rates. Judges are neither bankers nor lenders and do not have the expertise to set interest rates.").

I conclude that in view of the credible evidence and testimony adduced in these cases, as further discussed in Parts II.B & C, *infra,*[33] it is appropriate to consider how the marketplace would assess the level of risk associated with a similarly situated borrower's ability to satisfy the payment obligations proposed under the Debtors' Plan. *Cf. In re Underwood,* 87 B.R. 594, 599 (Bankr.D.Neb. 1988) (noting that differences in interest rate methodologies are "largely superficial," as courts applying both coerced loan and riskless rate approach consider quality of securi-ty and risk of default under plan). This hypothetical similarly situated borrower will have the Debtors' profile and characteristics, with the notable exception of pending chapter 11 proceedings. Such market rate will be reduced in order to account for the lender's profit and cost of servicing the loan.

### B. Debtors' Witnesses

Messrs. Phillips and Tepner testified that the interest rate under the Debtors' Plan affords the Banks the present value of their claim through a stream of future payments. Mr. Phillips had been a commercial banker in the cellular telephone industry prior to 1989. Since that time, however, his only knowledge of the cellular lending market has come by way of reading trade publications which cross his desk. Tr. at 56. Debtors' counsel, in the proffer of Mr. Phillips' testimony, stated that the Debtors' proposed interest rate was justified "based upon his (Mr. Phillips') experience as a lender to the cellular industry." *Id.* at 54. Counsel later admitted during the Banks' cross-examination of Mr. Phillips, however, that "we have already established that he's not aware of the new lending in this industry, because he hasn't been a banker since 1989." *Id.* at 60. Thus, I will take into account Mr. Phillips' limited knowledge of the current cellular lending market in evaluating whether the Debtors have proposed an adequate cramdown interest rate.

Mr. Tepner testified that the interest rate under the Debtors' Plan was appropriate. Mr. Tepner is an investment banker, not a commercial banker.[34] Having never priced or negotiated a loan to a cellular telephone company, he based his testimony on a list he had prepared of recent loans to other borrowers in the cellular industry. Thus, the significance to be accorded Mr. Tepner's testimony primarily depends upon whether the loans he identified are comparable to a hypothetical loan that would be made to a hypo-

---

33. Neither plan proponent proffered a witness who opined as to the applicable risk-free rate of interest. *Cf. Bloomingdale,* 155 B.R. at 981 n. 15 (expert witness testified as to applicable risk-free rate after having determined weighted duration of payments under debtor's plan and average yield of treasury bonds of equivalent duration).

34. Mr. Tepner stated he had participated in "making small but relatively insignificant commercial loans," tr. at 228–29, and was only qualified "as an expert in valuations and review of feasibility of financial projections in reorganization cases." *Id.* at 110; *see also id.* at 116, lines 12–13.

thetical company with these Debtors' characteristics.

Mr. Tepner's compilation, titled "Summary of Certain Bank Financing Terms for Selected Cellular Companies" and admitted into evidence as Debtors' Exhibit 72 (the "Summary of Bank Financing"), lists certain components of recent loans to seven cellular telephone companies. The Summary of Bank Financing does not attempt to report the precise terms of such loans. It does not, for example, set forth whether such loans include covenants which require a particular loan-to-pop ratio.[35] This Summary indicates that interest rates in loans made to cellular borrowers since April 1991 range from LIBOR plus 1% to LIBOR plus 3%. Mr. Tepner testified that the loans to Cellular, Inc., which was "somewhat comparable" to the Debtors in terms of its markets, and to Vanguard Cellular, which is a "substantially larger company" than the Debtors, were most appropriate for comparison.[36] Tr. at 177.

Mr. Tepner's characterization of Vanguard Cellular as substantially larger than the Debtors is supported by the information collected in the "Summary of Financial Information" which Mr. Tepner also prepared. This Summary states that Vanguard Cellular has 6.9 million pops and has a market capitalization of $997 million. Over the last twelve months, Vanguard Cellular's net revenue was $112.9 million and its EBITDA was $23.8 million. By comparison, the Debtors' net revenue for the first ten months of 1993 was approximately $11.5 million and the Debtors' projected 1993 EBITDA was slightly under $4 million. Consolidated Income Statement at 1. Thus, while the Debtors have not attained maturity, tr. at 59, Vanguard is a mature cellular company which has generated substantial positive EBITDA.

Cellular Inc.'s performance appears comparable to the Debtors' in that it had a negative EBITDA of $1.8 million over the last twelve months. However, Cellular Inc. is also larger than the Debtors, with 2.6 million pops to the Debtors' approximately 920,000 pops. Summary of Financial Information at 1. Cellular Inc. has $259.7 million in long term debt, its net revenue for the past twelve months was $33.7 million, and its market capitalization is in excess of $350 million. Id. at 1. The Banks' expert witness on senior secured lending in the cellular industry, Mr. David Gray, testified that Cellular Inc. has "a slightly favored status among cellular companies in terms of where it has access to money( )" because it borrows from the National Bank for Cooperatives. Tr. at 345. While I would not expect Mr. Tepner to discover a cellular telephone company which has approximately 920,000 pops and had recently negotiated a senior secured loan in the principal amount of $94.5 million, I do not find the two companies which he identified for comparison as appropriate comparables in terms of size, capitalization or access to capital.

## C. Banks' Witnesses

The Banks presented three witnesses in support of their argument that the Debtors' Plan does not set forth an adequate cramdown rate. The Banks contend that a hypothetical company which has the same profile as the Debtors would not be able to obtain $94.5 million in a senior secured loan under current market conditions. In order to determine the market rate of interest on a $94.5 million claim when the market would not advance such funds on a senior secured basis, the Banks' witnesses used the investment band technique. This methodology assumes that the Debtor would be able to incur

---

**35.** The loan-to-pop ratio equals the outstanding principal amount of the loan divided by the borrower's pops. For example, if the outstanding loan balance is $10 million and a borrower has 200,000 pops, the loan-to-pop ratio is $50.

**36.** Even a cursory review of the Summary of Bank Financing indicates that certain listed loans are not comparable to a $94.5 million loan which would be made to a hypothetical company with the Debtors' characteristics. The Associated Communications loan, for example, was a $20

million non-recourse loan for a cellular joint venture. The Cellular Communications loan was for $400 million, and according to the Debtors' "Summary of Financial Information for Selected Cellular Companies," ("Summary of Financial Information"), Cellular Communications is substantially larger than the Debtors. This Summary reports that Cellular Communications has 7.9 million pops and a market capitalization in excess of $1.9 billion.

$94.5 million of indebtedness, but that only a certain portion of such funds would be raised through a senior secured loan, with the remainder through a subordinated loan. *Cf. SM 104,* 160 B.R. at 233–34 (applying band of investment technique in single asset real estate case); *Bloomingdale,* 155 B.R. at 984–85 (same).

The Banks' first witness, Mr. David Gray, is a first vice president in the Corporate Finance Division at Kansallis–Osake–Pankki ("KOP"). KOP is a Finnish commercial bank which is the fifth largest lender to the cellular industry. Mr. Gray testified that he had priced between fifty and one hundred senior secured loans which had a total face value in excess of five billion dollars. Although Mr. Gray was qualified as an expert on interest rates in "commercial banking loans to cellular companies(,)" he only testified with respect to the senior secured band of debt which would be available to the aforementioned hypothetical borrower. Tr. at 310.

Mr. Gray testified that the Debtors would not be able to obtain as much as $94.5 million in senior secured financing on the open market. I find that Mr. Gray's conclusion is sound. Mr. Gray noted that lenders consider a cellular company's pops when the company is not sufficiently mature to generate cash flow to service its debt.[37] Mr. Gray testified that because senior secured cellular loans have a loan-to-pop ratio in the range of $45 to $50, it was highly unlikely that a company with the Debtors' pops would be able to obtain a $94.5 million senior secured loan because that would mandate a loan-to-pop ratio of approximately $100. *Id.* at 314–15. Mr. Gray further opined that the principal amount of a senior secured loan is usually in the range of six to twelve times trailing cash flow, and a $94.5 million senior secured loan to a company with the Debtors' cash flow would require a loan which would be in excess of twenty-five times trailing cash flow. *Id.* at 322.

Mr. Gray concluded that a hypothetical company which had the Debtors' operating history and profile, with the exception of these chapter 11 proceedings, could obtain between $45 to $50 million through a senior secured loan. *Id.* at 317. Mr. Gray testified that the interest rate under such loan would be LIBOR plus 3% plus a 2% commitment fee. *Id.* I will accord Mr. Gray's testimony, due to his experience in and knowledge of the cellular lending industry, substantial weight.

Mr. Kenneth MacWilliams, formerly president of Prudential Equity Management Associates and president of Prudential Capital Corporation, testified as an expert with respect to the pricing of subordinated loans. Mr. MacWilliams assumed that the Debtors had a going concern value of approximately $100 million and, in accordance with Mr. Gray's testimony, that the Debtors would obtain between $45 and $50 million in a senior secured loan. *Id.* at 368. Mr. MacWilliams testified that his opinion as to the subordinated debt interest rate would only marginally change if the Debtors had a going concern value, as the Debtors have asserted, of between $125 and $150 million. Mr. MacWilliams placed himself in the shoes of the lender making the subordinated loan and explained that, "I am not making this loan to have to come back to this Court to get repaid, play a game of Old Maid and be the next person sitting in the seat. I am making this loan to get repaid from earnings and changing the [Debtors'] capitalization doesn't do anything to the cash flows that I have seen." *Id.* at 372.

Mr. MacWilliams testified that the interest rate for the hypothetical $44.5 million subordinated loan would be 200 to 250 basis points above the interest rate under the hypothetical $50 million senior secured loan.[38] *Id.* at 369. As Mr. MacWilliams has significant experience in pricing subordinated loans and the assumptions upon which Mr. MacWilliams based his opinion are valid, I will accord his testimony substantial weight.

---

37. As Mr. Phillips admitted, the Debtors are not a mature cellular company. Tr. at 59.

38. Although Mr. MacWilliams stated that the subordinated loan interest rate could be as low as 150 basis points above the senior secured interest rate, he testified that it was more likely that this interest rate would be at least 200 basis points above the senior secured rate. Tr. at 369.

Mr. Steven Miller, a vice president and senior market analyst at Loan Pricing Corporation, also testified on the Bank's behalf as an expert on "the pricing of loans." Tr. at 350. Mr. Miller prepared a list of recent publicly filed commercial loans for cellular borrowers from information recorded in Loan Pricing Corporation's database. As Mr. Miller's testimony was repetitive in light of Mr. Gray and Mr. MacWilliams' respective opinions, I find that Mr. Miller's testimony does not assist the Court in determining whether the Debtors have proposed an appropriate cramdown interest rate. *See* Fed. R.Evid. 403.

### D. The Banks' Alleged Prepetition Misconduct

■ The Debtors assert that I must consider whether the Debtors' Plan treats the Banks in a fair and equitable manner in light of the Banks' alleged prepetition misconduct. In other words, the Debtors argue that the Court must decrease an otherwise appropriate cramdown interest rate in order to account for those allegations. As previously noted, the Banks' alleged malfeasance is the subject of the Lender Liability Suit which the Debtors will prosecute if their plan is confirmed,[39] and which is compromised if the Banks' Plan is confirmed. I find that regardless of the Lender Liability Suit's outcome, consideration of that Suit's allegations would not be in keeping with section 1129(b)'s fair and equitable test. Assuming, *arguendo,* that the Debtors' Plan is confirmed, the Lender Liability Suit would be resolved pursuant to one of the following scenarios:

1. A judgment is entered in favor of the Debtors in an amount in excess of the Banks' claim.

2. A judgment is entered in favor of the Debtors in an amount less than the Banks' claim.

3. A judgment is entered in favor of the Banks.

One must recall that the Banks are treated fairly and equitably if, at minimum, they receive the present value of their claim through a stream of future payments. If the first scenario occurs, after setoff the Banks will no longer have any claim against these Debtors. Therefore, the present value of the stream of payments would be irrelevant because the Banks would not receive any funds from these Debtors' estates.

If either the second or third scenarios occur, the Banks will hold a claim against the Debtors which must be satisfied through a stream of future payments. Under either scenario the Banks' claim would have been reduced to account for liability, if any, arising out of the Banks' alleged prepetition misconduct. The Debtors would have to satisfy the Banks' remaining claim by providing the Banks with a stream of payments which have a value equal to the potentially reduced amount of the Banks' claim. Since the Banks' claim under either the second or third scenarios would account for any liability arising out of their prepetition acts, I would be counting such acts twice if the allegations of wrongdoing were used as a basis to approve a cramdown interest rate which did not adequately compensate the Banks for the quality of the collateral and the risk of repayment under the Debtors' Plan.[40] Therefore, I need not consider the Lender Liability Suit's allegations or potential in determining whether the Debtors have proposed an appropriate cramdown interest rate.

### E. Adequacy of Debtors' Cramdown Interest Rate

■ As previously discussed, the Debtors' cramdown interest rate must provide for a stream of payments that has a present value equal to the amount of the Banks' claim. In view of Mr. Gray's credible testimony that a hypothetical company with the Debtors' pro-

---

**39.** As discussed in Part IV, *infra,* the Debtors seek a minimum of $80 million in compensatory damages and an additional $20 million in punitive damages.

**40.** The Debtors did not demonstrate that there was a high probability that prosecution of the

Lender Liability Suit would result in a large judgment in their favor. If such a showing had been made, the Debtors could have argued that the risk of repayment would be decreased, as the Debtors would only have to satisfy a greatly reduced Banks' claim under the Debtors' Plan.

file would only be able to incur between $45 and $50 million through a senior secured loan, I conclude that it is appropriate to apply the investment band technique to gauge whether LIBOR plus 3% is an adequate cramdown interest rate.

The competitive challenges and risks that the Debtors will encounter after they emerge from these chapter 11 proceedings have already been discussed. *See supra* Part I. Considering that analysis in light of Mr. Gray's testimony, I conclude that a hypothetical company with the Debtors' characteristics, with the aforementioned exception of pending chapter 11 proceedings, would be able to incur $46 million in senior secured debt. In order to account for the lender's profit margin and cost of servicing the loan, I eliminate the 2% commitment fee and reduce the interest rate by 20 basis points. Therefore, an acceptable interest rate for the $46 million senior secured band of the $94.5 million claim is LIBOR plus 2.8%.

This leaves $48.5 million which would be raised pursuant to a subordinated loan. In view of Mr. MacWilliams' credible testimony concerning the interest rate under the hypothetical subordinated loan, the challenges that will confront the post-confirmation Debtors, the lender's profit margin and cost of serving the subordinated loan, I conclude that the subordinated band interest rate is LIBOR plus 4.8%, or 200 basis points above the senior secured rate of LIBOR plus 2.8%. On a blended basis, an adequate cramdown rate for the entire $94.5 claim under the Debtors' Plan would be LIBOR plus 3.82% or 82 basis points above the Debtors' proposed cramdown rate.

It is therefore concluded that the Debtors' Plan does not satisfy section 1129(b)'s fair and equitable test because the Debtors' cramdown rate is substantially lower than the rate which would provide the Banks with the present value of their fully secured claim through a stream of future payments. In view of the foregoing, confirmation of the Debtors' Plan is denied.

### III. Banks' Plan

The Debtors assert that the Banks' Plan does not satisfy the dictates of sections 1129(a) and (b), and that the Banks' proposed settlement of the Lender Liability Suit cannot be approved. I first address the Debtors' section 1129 objections and then consider the proposed settlement's merits.

#### A. Good Faith & Feasibility

As the Debtors' objections that the Banks' Plan has not been proposed in good faith and is not feasible are inextricably intertwined, I will consider these objections in tandem.

The Debtors argue that the Banks' Plan has not been proposed in good faith because the Banks have proposed a plan of reorganization whose purpose is not to rehabilitate, but to liquidate the Debtors. The Banks' Plan is premised upon the Debtors meeting their own cash flow projections, and the Banks have candidly stated that they do not believe that the Debtors will meet those projections. The Debtors stress that the Banks did not develop an independent feasibility study which would illustrate the Debtors' ability to satisfy the payment obligations under the Banks' Plan.[41] The Debtors further assert that the Banks' Plan contains a series of payment obligations and covenants which are designed to cause the Debtors to default; *e.g.,* in the event of certain defaults under the Banks' Plan, "the Banks may file a motion . . . seeking the appointment of a person (the "Responsible Person") with rights, powers and duties including, without limitation, the power to exercise control of the Debtor's business operations, replace management and sell the Debtors' Property for the benefit of creditors." Banks' Plan § 4.1.

The Banks, while admitting that they do not expect the Debtors to meet the Debtors' cash flow projections, respond that their Plan was proposed in good faith because it grants the Debtors a fair opportunity to operate their business and repay the Banks. The Banks stress that their Plan is based upon

---

41. During the trial, the Debtors moved to dismiss the Banks' Plan on the ground that the Banks did not demonstrate that such Plan was feasible. The ruling on that motion is incorporated in this Memorandum Decision.

the Debtors' projections and business plan, and note that the Debtors can satisfy payment obligations even if the Debtors' cash flow is actually 20% below the Debtors' cash flow projections. The Banks also note that the plain language of section 1129(a)(11) provides that a plan is feasible if it includes a means for liquidating a debtor's property. *See* 11 U.S.C. § 1129(a)(11); *see also* H.R.Rep. No. 595 at 413.

Section 1129(a)(3) requires that "(t)he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). As described by the Second Circuit, "(t)he good-faith test means that the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 843 F.2d 636, 649 (2d Cir.1988) (citations and quotations omitted). A plan proponent satisfies the good faith test " 'if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.' " *In re Texaco Inc.*, 84 B.R. 893, 907 (Bankr.S.D.N.Y.) (*citing Hanson v. First Bank of South Dakota*, 828 F.2d 1310, 1315 (8th Cir.1987) (quotation omitted)), *appeal dismissed, Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.)*, 92 B.R. 38 (S.D.N.Y.1988). "The evaluation of good faith is not based on the plan proponents' behavior prior to the filing of the bankruptcy petition(,)" *In re General Homes Corp.*, 134 B.R. 853, 862 (Bankr.S.D.Tex. 1991), but instead, "in light of the totality of the circumstances surrounding confirmation." *In re Jandous Elec. Constr. Corp.*, 115 B.R. 46, 52 (Bankr.S.D.N.Y.1990) (*citing Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (In re Sandy Ridge Dev. Corp.)*, 881 F.2d 1346, 1353 (5th Cir.1989)). Section 1129(a)(11)'s feasibility requirement provides that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). As I stated in *In re Johns–Manville*, 68 B.R. 618 (Bankr. S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir.1988):

A Bankruptcy Court, in determining the feasibility of a proposed plan of reorganization should "scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable." *In re Monnier Brothers*, 755 F.2d 1336, 1341 (8th Cir.1985). The plan proponent is not required to guarantee the ultimate success of the reorganized company. *Id.; In re Wolf*, 61 B.R. 1010, 1011 (Bankr. N.D.Iowa 1986). Rather, the plan proponent is only required to provide a "reasonable assurance of success". *In re Trail's End Lodge, Inc.*, 54 B.R. 898, 904 (Bankr.D.Vt. 1985). *Id.* at 635. The Second Circuit, in construing the feasibility requirement under Chapter XII of the former Bankruptcy Act, 11 U.S.C. § 872 (1976) (repealed), noted that " '(t)he test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.' " *Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman)*, 585 F.2d 1171, 1179 (2d Cir.1978) (citation omitted). While visionary or speculative plans are not acceptable, *In re One Times Square Assocs. Ltd. Partnership*, 159 B.R. 695, 709 (Bankr. S.D.N.Y.1993) (*citing Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir.1985) (quoting 5 *Collier on Bankruptcy*, P. 1129.- 02(11) at 1129–34 (15th ed. 1984))); *accord In re Drexel Burnham Lambert Group Inc.*, 138 B.R. 723, 762 (Bankr.S.D.N.Y.1992), the plan proponent need only demonstrate that "there exists the reasonable probability that the provisions of the Plan can be performed." *Id.* A plan does not fail the feasibility test if there is a possibility, or even a probability, of a liquidation under the plan, so long as the means for a liquidation "is proposed in the plan." 11 U.S.C. § 1129(a)(11).

At the beginning of these proceedings, the parties were often unable to sit at the same negotiating table, requiring a court-appointed mediator to shuttle between the two parties

camped in separate meeting rooms.[42] I have observed the Banks' conduct throughout this proceeding, and have reviewed each of the Banks' proposed plans. *Cf. Jasik v. Conrad (In re Jasik)*, 727 F.2d 1379, 1383 (5th Cir. 1984) ("The bankruptcy judge is in the best position to assess the good faith of the parties' proposals.") The Banks have consistently maintained that the Debtors' projections are not reasonable. The Banks' response to such projections has been to call the Debtors' bluff, as the Banks' Plan is based on the Debtors' projections, with the aforementioned 20% cushion. The Banks, through numerous revisions and modifications to their Plan, have satisfied the Debtors' objection that the Banks' Plan was crafted to cause the Debtors to default. I need not provide a detailed accounting of the call and response nature of these exchanges, and simply note that the Debtors' two remaining objections were effectively rebutted by Banks' counsel at closing argument and do not merit further discussion.

After reviewing the Debtors' projections, *see* Consolidated Income Statement, coupled with the payment obligations and covenants under the Banks' Plan,[43] I find that the Debtors can satisfy their obligations even if their cash flow is actually 20% below their projected cash flow.[44] I note that while interest will accrue on the Banks' claim at prime plus 1% per year,[45] the Banks' Plan limits the Debtors' obligation to pay accrued interest. During the first year after the effective date, the payout interest rate is the lesser of 3% or prime plus 1%, and thereafter interest shall be paid at the lesser of prime plus 1% or 7%. The difference, if any, between the interest accrued and paid shall be added, calculated on a monthly basis, to the principal amount of the Banks' Claim.

I find, in light of the totality of circumstances surrounding the confirmation process in these chapter 11 proceedings, that the Banks' Plan is proposed in good faith. I further find that the Banks' Plan is feasible because the Banks have demonstrated that there is a reasonable assurance of success under such plan including, if necessary, the means for liquidating the Debtors' property.

## B. Fair and Equitable Treatment of Impaired Equity Security Holders

■ I have assumed, *arguendo*, that Equity is impaired under the Banks' Plan. The Banks must demonstrate, by a preponderance of the evidence, that Equity is treated fairly and equitably. Section 1129(b) provides that a class of equity security holders is treated fairly and equitably if such class retains, on account of each holder's interest, property of a value, as of the effective date of the plan, equal to the value of each equity security holder's interest. 11 U.S.C. § 1129(b)(2)(C)(i). As previously indicated, it was found that the Debtors' going concern value is $110 million. From this figure, the Banks' $80 million claim [46] and approximately $10 million for distributions to unsecured creditors and administrative expense claimants are subtracted to arrive at $14 million

42. The mediator, in accordance with the confidential nature of such proceedings, did not inform the Court of the parties' respective bargaining positions. The mediator did keep the Court informed as to the progress of the mediation effort. *Cf. In re Adoption of Procedures Governing Mediation of Matters in Bankruptcy Cases and Adversary Proceedings* (Bankr.S.D.N.Y. Nov. 12, 1993) (section 5.1 provides for confidentiality of mediation as to court and third parties). I am aware of the parties' inability to meet in the same room because when a mediation session was held in the courthouse, the parties requested that my staff locate and reserve two separate rooms.

43. The Banks' Plan contemplates that the parties will enter into a Fifth Amended and Restated Loan Agreement. Although certain covenants are set forth in that Agreement, as such Agreement is incorporated into the Banks' Plan, I will refer solely to the Banks' Plan.

44. The Debtors' argument that the Banks' Plan is not feasible is weakened in light of Mr. Tepner's testimony that the Debtors' would encounter significant difficulty in satisfying obligations under the Debtors' Plan if actual cash flow was 15% below projections. Tr. at 165.

45. The Debtors did not object that the Banks will receive more than the present value of their claim through the stream of payments proposed under the Banks' Plan.

46. As discussed in Part IV, *infra*, the Banks propose to settle the Lender Liability Suit in exchange for a $14.5 million reduction in the principal amount of their claim.

for the value of Equity's interest. As the respective Equity Security Holders retain their interests in CIS, the relevant inquiry is what is the value of Equity's interest under the Banks' Plan.

Not a single Equity Security Holder has objected to the Banks' Plan. Although the Debtors assert that Equity does not retain the value of its interest under the Banks' Plan,[47] this argument is not compelling in light of the fact that the Debtors can meet their obligations under the Banks' Plan if their actual cash flow is 20% below their projected cash flow. Furthermore, the Debtors used such projections to argue that the value of Equity's interest was, at minimum, $30 million. I find, after considering the Debtors' obligations under the Banks' Plan in light of the foregoing valuation analysis, that the present value of Equity's interest under the Banks' Plan is $14 million. In view of the foregoing, I conclude that the Banks' Plan satisfies the requirements of section 1129(b)(2)(C)(i), without reference to the proposed settlement of the Lender Liability Suit, and is confirmable over Equity's rejection.

## IV. Banks' Proposed Settlement of Lender Liability Suit

 CIS and CIS–I (the "Plaintiffs") have commenced an action against the Banks which is premised on the Banks' alleged prepetition misrepresentations and misconduct (the "Lender Liability Suit"). This Suit seeks, at minimum, $80 million in compensatory damages and $20 in punitive damages. The Banks' Plan proposes to settle the Lender Liability Suit in exchange for an approximately $14.5 million reduction in the principal amount of the Banks' claim.[48] As previously noted, this leaves the Banks with an $80 million secured claim under their plan.

The Debtors argue that the Banks have not proposed a settlement because the "Banks' (sic) seek to agree with themselves as to what their liability should be." Debtors' Post–Trial Memorandum of Law In Opposition to Confirmation of Banks' Plan at 25. The Debtors correctly note that the proposed disposition and adjustment of the Lender Liability Suit, an asset of CIS and CIS–CIS–1's respective estates, is not the product of arms-length negotiations between the Plaintiffs and the Banks. This, however, in no way bars consideration of the proposed settlement.

First, as discussed *infra*, this settlement results from negotiations and discussions with Committee Counsel and is supported by the Committee. Second, the Code expressly provides that a plan proponent may propose a settlement of any claim held by the estate. 11 U.S.C. § 1123(b)(3)(A) ("a plan may ... provide for ... the settlement or adjustment of any claim or interest belonging to the debtor or to the estate (.)"); *cf. Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.)*, 844 F.2d 1142 (5th Cir. 1988) (Court approved plan, proposed by lawsuit defendant and committee of unsecured creditors, which provided for settlement of suit in exchange for, *inter alia*, expungement of defendant's $7 million claim against debtor. Chapter 11 trustee, while not a plan proponent, supported the plan.).

### A. Standard of Review

The Supreme Court in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), instructed that it is "the duty of a bankruptcy

---

**47.** The Debtors' lack of standing to raise this argument on behalf of the Equity Security Holders is inconsequential in light of the Banks' burden of proof on this issue. *See Johns–Manville*, 68 B.R. at 623 ("[N]o party may successfully prevent the confirmation of a plan by raising the rights of third parties who do not object to confirmation.").

**48.** The Banks argue that I should also consider that the treatment of the Banks' $80 million claim on terms which are more advantageous than could be obtained in the current market serves as additional consideration towards the proposed settlement. *See* Banks' Memorandum Re Settlement of Adversary Proceeding at 1. However, I previously considered the treatment of the Banks' claim in concluding that the Banks' Plan is feasible and that equity is treated fairly and equitably under the Banks' Plan. Therefore, such plan provisions will not simultaneously serve as consideration towards the proposed settlement.

court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable." *Id.* at 424, 88 S.Ct. at 1163. A bankruptcy judge can only discharge this duty after he has:

> apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*Id.* at 424–25, 88 S.Ct. at 1163. As the Second Circuit has noted, a bankruptcy court need not have knowledge of all of the facts relevant to a suit's resolution, as "(t)he Supreme court could not have intended that, in order to avoid a trial, the judge must in effect conduct one." *Weinberger v. Kendrick,* 698 F.2d 61, 74 (2d Cir.1982) (citations omitted), *cert. denied sub nom., Lewy v. Weinberger,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983) (citations omitted); *see also Drexel,* 138 B.R. at 759 ("Approval of a settlement does not require a 'mini-trial' on the merits.") (citations omitted). For a court's mission is "not to decide the numerous questions of law and fact raised by (the parties) but rather to canvass the issues and see whether the settlement 'fall(s) below the lowest point in the range of reasonableness.'" *Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 608 (2d Cir.) (quoting *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom., Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972)), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

Courts have considered the following four factors in determining whether a proposed settlement lies below the range of reasonableness:

1. the probability of success on the merits;

2. the difficulties that may be encountered in collection;

3. the complexity of the litigation and the attendant expense, inconvenience and delay; and

4. the "paramount" interests of creditors.

*In re Purofied Down Prods.,* 150 B.R. 519, 522 (S.D.N.Y.1993) (*citing Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929)); *accord In re W.T. Grant Co.,* 4 B.R. 53, 69 (Bankr. S.D.N.Y.1980) (Galgay, J.) (subsequent history omitted). Courts have also weighed the degree to which the settlement is supported by parties in interest, the competency and experience of counsel who support the settlement, the relative benefits to be received by members of any affected class, and the extent to which the settlement is the product of arm's-length bargaining. *Drexel,* 138 B.R. at 758 (citations omitted).

Familiarity with the Lender Liability Suit's allegations is necessary to put the respective plans in perspective. Thus, the following highly abbreviated narrative of the Banks' prepetition relationship with the Plaintiffs may be useful.[49]

### B. Background

In September 1989, CIS–1's predecessor-in-interest entered into a short-term $90 million revolving loan facility with four banks; First Maryland, PNC, NatWest and KOP (the "Revolving Loan"). In October and November 1989, these banks and CIS discussed the merits of entering into a long-term $160 million facility, pursuant to which each bank would commit $40 million (the "Term Loan"). NatWest, PNC and First Maryland committed to fund $105 million under the Term Loan, with NatWest and PNC each furnishing $40 million and First Maryland the remaining $25 million. KOP declined to participate in the Term Loan.

---

**49.** I stress that the following neither amounts to findings of fact nor a complete recitation of the parties' respective allegations. It does not summarize the voluminous record created through pre-action discovery. Instead, it simply provides a snapshot of the broad outlines of the parties' relationships.

In conjunction with the Term Loan, on or about December 8, 1989, CIS sold 2.8 million shares of Class A Common Stock to the investing public (the "Offering") and realized approximately $28 million from the proceeds. Approximately $27 million of such proceeds was used to pay down the Revolving Loan.

In connection with the Offering, PNC and First Maryland issued a highly confident letter, dated November 20, 1989 (the "Highly Confident Letter"). PNC and First Maryland stated that, "they [were] highly confident that they [would] be able to obtain commitments for ... the remaining $55 million of the [Term Loan] not later than January 31, 1990." Highly Confident Letter at 1. This expression of confidence was qualified, as it was "based upon current market conditions(.)" *Id.* In conjunction with the Highly Confident Letter, CIS executed an indemnification letter, dated November 20, 1989 (the "Indemnification Letter"). This Letter provides that CIS would indemnify and defend PNC and First Maryland from "any and all losses, liabilities, claims, damages or expenses incurred by any of them arising out of or by reason of any investigation, litigation or other proceedings brought or threatened related to or arising out of the [Highly Confident Letter] or the transactions contemplated therein." Indemnification Letter at 1. Such indemnification does not, however, apply to "losses, liabilities, claims, damages or expenses determined ... to have resulted primarily by reason of the gross negligence or willful misconduct of the indemnitee." *Id.*

In late December 1989, CIS–1's predecessor-in-interest entered into the Term Loan and NatWest became a co-agent for syndicating this facility with PNC and First Maryland. The Banks were unable to raise the remaining $55 million by January 31, 1990. Plaintiffs assert that during this period they relied on representations made by the Banks to raise the balance of the Term Loan and they forewent other financing, albeit on different terms. The Plaintiffs assert that the Banks' failure to raise the $55 million was due to, *inter alia*, an inexcusably lackluster effort.

In September 1990, CIS obtained a one-year $60 million loan commitment from NovAtel, a cellular equipment vendor (the "NovAtel Loan"). In conjunction with the NovAtel Loan, CIS was required to purchase certain cellular equipment from NovAtel. In order to close the NovAtel loan, CIS needed the Banks to consent to split their collateral so that certain of their collateral could be used to secure the NovAtel Loan. In exchange for the Banks' consent, CIS was required to use $47 million from the NovAtel Loan to pay down the Term Loan. In addition, the Term Loan's term was decreased from ten years to two years. The parties dispute whether the Banks' actions with respect to the renegotiated Term Loan were appropriate.

Before engaging in the analysis of whether the Banks' proposed settlement falls within the range of reasonableness, *see W.T. Grant*, 699 F.2d at 608. I will outline the extent to which this Court has been "exposed to the litigants, and their strategies, positions and proof." *Weinberger*, 698 F.2d at 73 (quotation omitted). The Plaintiffs and the Banks participated in informal and Federal Rule of Bankruptcy Procedure 2004 discovery with respect to the Banks' prepetition acts prior to the filing of the Lender Liability Suit. I conducted several Local Rule 13(k) conferences to resolve certain discovery related disputes.[50] These conferences allowed me to gage the tensions between the parties and to estimate the voluminous discovery that prosecution of this Suit would generate.

Debtors' counsel's fee applications provided a unique window into their legal strategy. These fee applications, which I reviewed *in camera*, detailed the legal research counsel had undertaken in preparing the Lender Liability Suit, and in this fashion set forth the Plaintiffs' strategy. I have also reviewed the parties' respective legal memoranda with respect to the reasonableness of the settlement and the Banks' motion to dismiss the Suit,

---

**50.** S.D.N.Y. Local Bankruptcy Rule 13(k) provides, in pertinent part, that "[n]o discovery related motion ... shall be heard unless counsel for the moving party has first requested an informal conference and such request has either been denied or the discovery dispute has not been resolved as a consequence of such a conference."

certain of the approximately 25,000 documents produced during the course of discovery, and excerpts of certain deposition testimony. Thus, this Court is well within the loop of familiarity with respect to the complexities of this litigation.[51]

### C. The Probability of Success on the Merits

Here, the purpose is not to make findings of fact and conclusions of law, but to canvass the issues to assess the risks associated with prosecuting the various claims.

In the first count of their Amended Complaint, the Plaintiffs assert a fraud claim against the Banks based upon certain representations made in the Highly Confident Letter.[52] Whether Pennsylvania or New York state law applies to this cause of action, the Plaintiffs must overcome certain hurdles.[53] Assuming *arguendo* that the Plaintiffs relied upon such representations to their detriment, they must demonstrate that the Banks had knowledge of the representations' falsity and intended to induce reliance.

Although KOP's withdrawal and the decrease in First Maryland's participation may have made the transaction more risky, this, in and of itself, will not suffice to demonstrate the Banks' fraudulent intent. For just as "[i]ntending to participate in a risky transaction is not the equivalent of intending to perpetrate a fraud[,]" "[p]articipating in a

risky transaction, whatever the expected return, is not the equivalent of perpetrating a fraud." *Kas v. Chase Manhattan Bank, N.A.*, 1991 WL 275754, *6 (S.D.N.Y.1991). Furthermore, the Plaintiffs must establish that the facts do not defy economic reason but yield a reasonable inference of fraudulent intent. *Atlantic Gypsum Co., Inc. v. Lloyds Int'l Corp.*, 753 F.Supp. 505, 514 (S.D.N.Y. 1990); *cf. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 595, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986) (no motive for anti-trust conspiracy absent economically reasonable scheme). In view of the record established to date, I find it very likely that the Plaintiffs will only be able to prove "[f]acts that are merely as consistent with fraudulent intent as they are with its absence." *Kas*, 1991 WL 275754, at 2 (quoting *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 143 (2d Cir.1991)). Thus, I conclude that the Plaintiffs face significant evidentiary hurdles in prosecuting this claim.

The Plaintiffs next assert a breach of contract claim based upon the Banks' failure to exercise their best efforts in attempting to raise the balance of the $160 million facility from other banks and financial institutions. The duty of best efforts "requires a party to make such efforts as are reasonable in the light of that party's ability and the means at its disposal and of the other party's justifiable expectations." E. Allan Farnsworth, *Contracts* § 7.17, at 553 (2d ed. 1990). As

---

51. I have reviewed the Plaintiff's Amended Complaint; Memorandum Re Settlement of Adversary Proceeding Submitted by the Banks in Support of Fourth Amended Plan of Reorganization; Debtors' Memorandum in opposition to the Banks' Memorandum Re Settlement of Adversary Proceeding and in Further Opposition to the Banks' Fourth Amended Plan of Reorganization; Memorandum of Law of the Banks in Support of Their Motion to Dismiss the Amended Complaint; Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss; Reply Memorandum of Law of the Banks in Further Support of Their Motion to Dismiss the Amended Complaint; excerpts of deposition testimony of (a) Karen Zinman Seidle, taken May 19, 1993 and June 15, 1993; (b) Mark L. Cook, taken June 24, 1993; (c) William C. Maier, taken May 27, 1993; (d) Orville G. Aarons, taken May 20, 1993; (e) Peter Stitt Swain, taken June 18, 1993; and in addition, those documents, memoranda, and correspondence submitted to the Court in the context of the trial.

52. As NatWest was not a signatory to the Highly Confident Letter it is not a party to this count.

53. Under Pennsylvania law, the elements of fraud are "(1) a misrepresentation; (2) known to be false; (3) intended to induce action; (4) justifiable reliance on the misrepresentation; and (5) damages as a proximate result." *Kutner Buick, Inc. v. American Motors Corp.*, 868 F.2d 614, 620 (3d Cir.1989); *Delahanty v. First Bank*, 318 Pa.Super. 90, 108, 464 A.2d 1243, 1252 (1983). Under New York law, the elements are: "(1) a false representation of a material fact; (2) scienter, or knowledge or belief in its falsity; (3) belief in its truth by the person to whom the statement is directed; (4) the intent to induce reliance; and (5) detrimental reliance by the person claiming to be defrauded." *Keenan v. D.H. Blair & Co., Inc.*, 838 F.Supp. 82, 86 (S.D.N.Y.1993); *Virgilio Flores, S.A. v. Jerome Radelman, Inc.*, 567 F.Supp. 577, 579 (E.D.N.Y.1982).

previously noted, the Highly Confident Letter expressly provides that the Banks are "highly confident that they will be able to obtain commitments for ... the remaining $55 million of the Facility not later than January 31, 1990[,]" Highly Confident Letter at 1, and the Banks failed to secure such commitments.

The Plaintiffs' burden must be viewed in light of the Indemnification Letter. The Plaintiffs expressly agreed to indemnify the Banks for all claims, which did not arise due to the Banks' gross negligence or willful misconduct, "related to or arising out of the [Highly Confident] Letter or the transactions contemplated therein." Indemnification Letter at 1. In view of the evidentiary record, and because a party may intentionally relinquish a known right, *see, e.g., Civil Serv. Employees Ass'n Inc., Local 1000 v. Kinsella*, 194 A.D.2d 1054, 599 N.Y.S.2d 671, 673 (3d Dep't 1993); *Linda Coal & Supply Co. v. Tasa Coal Co.*, 416 Pa. 97, 100, 204 A.2d 451, 453 (1964), there is a reasonable likelihood that the Idemnification Letter will be enforceable against the Plaintiffs.

Even in view of these hurdles, the record developed to date, which includes certain documents memorializing the Banks' attempts to syndicate the Term Loan, leads me to conclude that there remains a possibility that the Plaintiffs could recover on this claim.

The third count asserts that the Banks breached their fiduciary duty to the Plaintiffs. The Plaintiffs contend, *inter alia*, that a fiduciary duty was created because First Maryland and PNC are described as "Co-Agents" in the Highly Confident Letter. *See* Highly Confident Letter at 1. The term "Agents," however, is not defined in the Highly Confident Letter. In view of the record and applicable law accumulated and reviewed in the course of pre-trial motion practice, it appears questionable that the Plaintiffs will be able to demonstrate that the Banks were their agents in this regard. *See Temp–Way Corp. v. Continental Bank*, 139 B.R. 299, 325 (E.D.Pa.), *aff'd without opinion*, 981 F.2d 1248 (3d Cir.1992) (lender is not a fiduciary of the borrower); *Popkin v. National Benefit Life Ins. Co.*, 711 F.Supp. 1194 (S.D.N.Y.1989) (finding a fiduciary relationship where an insurance company entered into an express agency agreement).

The Plaintiffs also assert that there was a fiduciary relationship based on the control allegedly exercised by the Banks over the Plaintiffs. *See The Cara Corp. v. Continental Bank (In re The Cara Corp.)*, 148 B.R. 760, 773 (Bankr.E.D.Pa.1992) ("A fiduciary relationship may arise between a lender and a borrower where the lender gains substantial control over the borrower's business affairs.") (citations omitted). The Plaintiffs assert that the Banks exercised undue control in the formulation of the NovAtel Loan. At trial, the Plaintiffs must demonstrate that the Banks exercised control beyond the normal lender-borrower relationship. *See Temp–Way*, 139 B.R. at 319. The record to date, viewed in light of the applicable law, suggests that it is highly unlikely that the Plaintiffs can successfully demonstrate that the Banks did not act as prudent lenders solely interested in protecting their collateral.

In counts four and five, the Plaintiffs assert claims grounded in the Banks' alleged negligence and gross negligence, respectively. After reviewing the applicable case law, I conclude that the Plaintiffs have the same possibility of success as discussed with respect to the Banks' alleged failure to exercise their best efforts.

In count six, the Plaintiffs assert a breach of the duty of good faith and fair dealing. While both New York and Pennsylvania recognize the implicit duty of good faith in the performance of a contract, this implied duty does not alter the rights and obligations guaranteed by statute or by contract. *See Creeger Brick and Bldg. Supply, Inc. v. Mid–State Bank & Trust Co.*, 385 Pa.Super. 30, 36–37, 560 A.2d 151, 154 (1989); *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 304, 448 N.E.2d 86, 91, 461 N.Y.S.2d 232, 237 (1983). Moreover, Pennsylvania does not recognize an implied contractual duty of good faith in the lender/borrower relationship. *Temp–Way*, 139 B.R. at 319. Since "it cannot be said that a lender has violated a duty of good faith merely because it has negotiated terms of a loan which are favorable to itself," the lender is "generally not liable for

harm caused to a borrower by refusing to advance additional funds, release collateral, or assist in obtaining additional loans from third persons." *Id.* at 320. In view of the foregoing and the record established to date, I conclude that it is highly unlikely that the Plaintiffs can succeed on this count.

The alleged RICO violations are predicated on fraud as alleged in the Suit's first cause of action and an alleged violation of the Hobbs Act, 18 U.S.C. § 1951 (1988) ("Whoever obstructs, delays or affects commerce . . . by robbery or extortion or attempts or conspires to do so . . . shall be fined not more than $10,000 or imprisoned not more than 20 years, or both."). Absent two predicate acts, the Plaintiffs cannot prevail on their RICO claims. As I have already summarized the difficulties facing the Plaintiffs in proving fraud, it is now appropriate to address the alleged Hobbs Act violation. The Plaintiffs assert that the Banks' negotiating posture with respect to the NovAtel Loan fulfills both the "wrongful means" and "wrongful use" elements necessary for a Hobbs Act violation. *United States v. Clemente,* 640 F.2d 1069, 1076 (2d Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981). The Plaintiffs must prove that the Banks lacked a "legitimate claim to receive payment or benefit" for their consent to the changes mandated by the NovAtel Loan. *United States v. Sturm,* 671 F.Supp. 79, 86 (D.Mass. 1987), *aff'd in part, vacated in part,* 870 F.2d 769 (1st Cir.1989). In other words, the Plaintiffs must demonstrate that the Banks engaged in extortion rather than hard-bargaining. *Viacom Int'l Inc. v. Icahn,* 747 F.Supp. 205, 213 (S.D.N.Y.1990), *aff'd on other grounds,* 946 F.2d 998 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1244, 117 L.Ed.2d 477 (1992). In view of the nature of the record thus far established, it is doubtful that the Plaintiffs can establish the necessary predicate acts.

Finally, in view of the Plaintiffs' waiver of punitive damages in the respective loan agreements, I do not find it likely that the Plaintiffs can establish any basis to recover punitive damages. *See, e.g.,* 1989 Term Loan Agreement § 8.11 ("Except as prohibited by law, each party hereto waives any rights it may have to claim or recover in any litigation referred to in this Section 8.11, any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages.")

### D. Difficulty of Collection

This factor is not relevant here. Any judgment in favor of the Debtors would be setoff against the Banks' $94.5 million claim, and there is no suggestion that the Banks would be unable to satisfy a judgment in excess of the amount of their claim.

### E. Suit's Complexity, Attendant Expense, and Interests of Creditors

As the foregoing discussion suggests, this Suit is somewhat complex. The Suit's attendant expense, inconvenience and delay, however, would not primarily be due to legal complexities but more on account of the parties' underlying emotionally hostile relationship. The Banks' counsel has estimated that the Banks would ultimately spend between $2 million and $2.25 million to defend this Suit through the appellate process. The Debtors, surprisingly, have failed to even account for the costs of litigation in their projections. In view of the course of pre-Suit discovery and litigation over the competing plans of reorganization, there can be no question but that this Suit will entail significant expense and inconvenience for all parties.

In considering the paramount interests of creditors, I find that this settlement allows the Debtors to concentrate on running their business and to put a significant element of their dispute with the Banks behind them. As counsel for the Debtors' second largest unsecured creditor noted during the trial's closing arguments, this litigation "would impose both a financial and personal burden upon the Debtor, which would detract from the operation of the business[.]" Tr. at 1096. As this Settlement will allow the Debtors' management to turn their attention towards running their cellular systems and building the value of Equity's stake, this Settlement also serves Equity's interests. I recognize that there is a risk that this Suit, if litigated, would produce more than a $14.5 million

reduction in the principal amount of the Banks' Claim. However, as the foregoing discussion indicates, this settlement guarantees that Equity's interest has some value, for it is not simply coincidence that the value of Equity's interest under the Banks' Plan is $14 million and this settlement entails a reduction in the Banks' claim of $14.5 million.

F. Settlement Negotiations

As previously noted, the proposed settlement is not the product of arms-length negotiations between the Plaintiffs and the Banks. The Banks had initially proposed to settle the Lender Liability Suit in exchange for a $5 million reduction in the principal amount of their claim. Committee counsel subsequently studied the pleadings, deposition transcripts, relevant documents and participated in a meeting in which the Plaintiffs and the Banks briefly presented their respective cases. *Id.* at 1102. Committee counsel, a partner at Davis Polk & Wardwell who has extensive experience in, *inter alia,* complex litigation mired in chapter 11 reorganizations, concluded that the $5 million proposed settlement was not appropriate. He conducted an independent analysis and his recommendation was adopted by the Banks. The Committee concurs that a $14.5 million reduction in the principal amount of the Banks' claim falls within the range of reasonableness. *Id.* at 1092.

In view of the foregoing, I conclude that the reasonable settlement range for the Lender Liability Suit, as measured in terms of a reduction in the principal amount of the Banks' claim, is between $10 and $20 million. Therefore, the Banks' proposed settlement, which provides for a $14.5 million reduction in such claim, falls within the zone or range of reasonableness and is approved.

V. Conclusion

In view of the foregoing, the Banks' Plan merits confirmation under section 1129 and is confirmed. Confirmation of the Debtors' Plan is denied.

IT IS SO ORDERED.

The Banks shall submit a confirmation order consistent with the foregoing.